UTICA,
July, 1836.

Parkhill
v.
Imlay.

PARKHILL and others *vs*. IMLAY.

Where an order is given for the purchase and transmission of a cargo of merchandize, a *substantial compliance* with the order on the part of the *factor* will charge the principal.

The omission of the factor to acknowledge the receipt of the order and to signify his acceptance of the commission will not discharge the principal, where the order is complied with and advice thereof given within a *reasonable time*

What will be deemed reasonable time depends upon the course of the particular trade, and the peculiar circumstances of the case; it is *not a question of law*, but of *fact*, to be submitted to and passed upon by a jury.

ERROR from the superior court of the city of N. York. On 8th November, 1832, William H. Imlay, residing at *Hartford*, in Connecticut, sent an order to Parkhill, Robertson and Kelso, a mercantile firm, transacting business at *Richmond*, in Virginia, to the effect: that if there was a vessel at Richmond bound to Hartford, which would take a cargo of wheat, at not to exceed 10 cents per bushel freight, and the wheat could be procured of good quality, they might send a cargo; adding that he was informed that there was a vessel at Richmond, commanded by *Capt. Waterman*, belonging at Hartford. The order was received per mail, the course of the mail bringing a letter from Hartford to Richmond in 5 or 6 days. Wheat being scarce at Richmond, one of the firm of Parkhill & Co. went down the *James River* about 80 miles, and purchased 2638 bushel of wheat of a planter, according to the usual course of business when wheat is not to be had at Richmond. On the 22d November, Parkhill & Co. engaged Capt. Baxter, of the schooner *Molly*, which was discharging a cargo of salt at Richmond, and had been there several days, vessels being at the time scarce, to carry the wheat to Hartford, at $\frac{10}{100}$ per bushel, and on the 25th November wrote to Imlay, advising him of the purchase of the wheat, and that no time would be lost in shipping it, and forwarding invoice, &c. On the 24th November the discharge of the cargo of the schooner was completed, and on the same day she went down the river; the wind was ahead, and she did not arrive at the place of

UTICA,
July, 1836.

Parkhill
v.
Imlay.

lading until the 28th November ; on which day she commenced taking in the wheat, but did not complete the lading until the 8th December, having been prevented from taking in the wheat full half the time by boisterous and rainy weather. On the morning of the 8th December, within an hour after completing the cargo, the schooner sailed for Hartford. On the 20th December she was in the Connecticut river, about 20 miles below Hartford, where she was prevented from going further by the ice and a strong head wind. The captain proceeded by land to Hartford, and on the evening of the same day called at the counting-house of Imlay to report himself and his cargo, and to obtain orders. Imlay was not at home, and his agent, to whom the report was made, refused to have any thing to do with the wheat, saying it had not been shipped according to orders. On the next day the captain again called on the agent, and offered to have the wheat transported to Hartford in wagons or carts at his own expense, and to deliver it free of any charge to Imlay, except the freight of $\frac{10}{100}$ per bushel, as stipulated in the original bill of lading ; to which offer the agent again answered, that he would not have any thing to do with the wheat, and would not receive it on any condition whatever. On the 21st December the captain returned to the schooner and proceeded with her down the river to *Saybrook*, where she, with the cargo, remained until the 22d February, 1833, when she was taken to New-York, and the cargo landed, and shortly after sold, at a loss of $339,34 below the original cost. It appeared that on the 30th *November*, 1832, Imlay wrote to Messrs. Parkhill & Co. acknowledging the receipt of their letter of the 25th of that month, in which he stated that when he ordered the wheat it was expressly with a view to its being shipped by *Capt. Waterman*, and that perceiving by the papers that Waterman had left Richmond before the receipt of his letter, he concluded *it* was the reason why he had received no reply to his letter, and in consequence had accomplished his purchases of wheat in *New York* a few days before : that it was then too late to get any thing up the Connecticut river until spring, on account of the season, and he therefore declined taking the wheat. It also appeared that on the 16th *December*, 1832, Imlay again wrote

Messrs. Parkhill & Co. acknowledging the receipt of their let-
ter of 11th December, with invoice of wheat, and advice of a
draft on him for $3517,57, and saying that he would neither
accept the draft, or consider the wheat as his property.  It
was proved that the order of Imlay for the wheat was execu-
ted with as much dispatch as practicable, and that no delay
other than what was unavoidable, from the state of the weath-
er, occurred from the time of the schooner *Molly* leaving Rich-
mond until she sailed from the place of lading for Hartford.
On the above facts appearing on the trial of a suit brought by
Parkhill & Co. against Imlay, the superior court of the city of
New-York *nonsuited* the plaintiffs, and judgment was ren-
dered against them for costs.   The plaintiffs sued out a writ
of error.

*S. Sherwood*, for plaintiffs in error.

*D. Lord, jun.*, for defendant in error.

*By the Court*, NELSON, J.   After a careful consideration
of the facts in this case, I am unable to concur with the dis-
position made of it by the superior court.   I have not seen
the reasons for their judgment, but will briefly examine the
points now relied upon to sustain it by the counsel for the
defendant in error.

It is said that the authority to purchase the wheat was upon
the condition that a vessel should be found at *Richmond* bound
to *Hartford*, which would take the wheat at a specified freight,
and also that the purchase of the wheat should be made at
*Richmond*.  The answer to all this is, that the vessel chartered
was at the place about the time the defendant's letter reached
there, which must have been, in the course of the mail, on the
14th or 15th of the month.  The Molly was chartered on the
22d, and one of the witnesses stated that she had been there
several days previous to the engagement; and as to the pur-
chase of the wheat at Richmond, there is nothing in the terms
of the order, nor in the nature of the transaction or the course
of trade, requiring such an execution of it.  The plaintiffs were
requested, if there was a vessel at Richmond that would take

a cargo of wheat to Hartford at 10 cents per bushel, to send one if they could procure it of good quality. Now it does not seem to me a harsh and unreasonably severe construction to say, that the purchase of the cargo some 80 miles nearer the place of its destination, where it is proved a better quality of the article can usually be procured, even if there had been a supply at Richmond, which there was not, was a departure from the authority conferred by its terms or spirit. Perhaps it may be implied that the defendant contemplated a purchase at Richmond, presuming that it could be found in the market; but if he had intended to make this an imperative condition upon the plaintiffs, it would have been easy and natural for him to have so said. They very honestly assuming that he meant substantially what he did say, viz. that he wanted a cargo of wheat of a good quality, with all reasonable dispatch, procured it; and now, when casualties over which the plaintiffs had no control, and for which they are not to be held responsible, delayed the arrival of it at its place of destination, it should not be permitted to him to set up that it was purchased at a different place from that designated, by a very strained inference from the order, and therefore without authority. But it is said that the execution of the order down the river occasioned delay, which the defendant intended to avoid at that season of the year. Whether it occasioned a delay beyond that which unavoidably arose from a faithful execution of the order, under all the facts and circumstances of the case, so as to constitute a departure from the authority given, was certainly not exclusively a question of law. As I understand the facts, the delay arose solely from the inclemency of the weather; and for aught that appears in the case, the execution of the order at *Richmond* would not necessarily or certainly have avoided this consequence. Even if the Molly could have sailed a few days sooner, she must still have encountered the storm on her voyage. But I deny that the plaintiffs are to be charged with the delay occasioned by the weather. If they executed the order with reasonable dispatch, and according to the course of that particular trade which the defendant is presumed to know, they have done their duty. That they did thus execute it, appears to be fully proved; and at all

events, if doubted, the point should have been submitted to the jury.

It is also urged that the plaintiffs were bound to have given immediate *notice of their purpose* to execute the commission, and that they omitted to do so from the 15th to the 25th November. It appears the plaintiffs, with customary diligence, set about executing the order on the receipt of it, and soon, if not immediately after it was accomplished, duly advised the defendant of the fact. They went down the river 80 miles in search of the wheat, purchased it, and gave directions for the delivery, returned, chartered a vessel, and wrote advising the defendant of all that was done, in the course of some 9 or 10 days. Advice in due time of the *execution of an order*, I apprehend, is all that can be reasonably required. Under the circumstances, the plaintiffs were not bound to return an immediate answer that they would execute it if possible. Being able in so short a time to determine definitively the point, they were not bound to communicate with the defendant till they had made the effort. The defendant had a right to presume, and should have acted upon the presumption, that the order would be executed if practicable. From his letter of the 30th *November* it appears that he acted upon the opposite inference. Not immediately hearing from the plaintiffs, he assumed they were neglecting his order, and he accordingly procured a supply of wheat elsewhere. This was doing injustice to the fidelity of his correspondents. It seems to me he should have presumed they were engaged in filling his order, and that if they had determined otherwise, he would have been duly advised. He had no right to assume they were neglecting his business, till he had given them a reasonable time to accomplish it. The answer of the defendant to the letter of advice of the purchase of the wheat, giving his reasons for not receiving the cargo, is not very satisfactory. He affects to believe that the order required the plaintiffs expressly to ship the wheat by *Capt. Waterman*, who could bring about 2000 bushels; and as he perceived from the papers that the captain had sailed before his order could have reached the plaintiffs, supposed that to be the reason why he had not heard from them. This is obviously an unfair interpretation of his own

UTICA,
July, 1836.

letter of the 8th November. He had no right to presume or believe his correspondents were thus instructed; and to insist and act upon that view of the case, was calculated to entrap them. They could draw no such inference from the terms of the order.

Upon the whole I am unable to say, as matter of law, that the plaintiffs were bound to forward an immediate answer to the order of the 8th November; but am of opinion the conduct of the plaintiffs in this respect turns upon a question of diligence, proper undoubtedly to be considered by the jury, when from all the facts and circumstances of the case, course of trade, &c., they are called upon to decide whether the plaintiffs have used reasonable dispatch in the execution of the order. This embraces not only the filling of it, but due advice of the fact. The point, I think, belongs to the jury.

Judgment reversed, *venire de novo*, costs to abide the event.