## THE PEOPLE, *ex rel.* Fountain and others, *vs.* THE BOARD OF SUPERVISORS OF THE COUNTY OF WESTCHESTER.

Where damages, sustained by the owners of land taken for the improvement of a public highway, under and by virtue of an act of the legislature, have been assessed by a jury, and the verdicts of the jury have been laid before the board of supervisors, who have liquidated and settled the amount of damages due to the land owners respectively, pursuant to the statute, such land owners have a vested right to the sums awarded to them respectively, for such damages; and are entitled to a writ of mandamus to compel the board of supervisors to cause the same to be raised and paid to them.

Such right will not be divested by a subsequent repeal of the statute under which the damages were assessed.

The general power of the legislature to destroy vested rights, by a repeal of the statute under which they were acquired, considered and discussed.

A legislative act, whether it be a positive enactment or a repealing statute, which takes away the vested rights of property of an individual for any purpose—except where property is taken for public use and upon a just compensation—is invalid, as being above the power, and beyond the scope, of legislative authority.

The reasoning of the court in *Butler* v. *Palmer,* (1 *Hill,* 324,) so far as it tends to the conclusion that the repeal of a statute can divest rights and interests in property, which have become vested under such statute, *held* to be unnecessary to the decision in that case, and as running counter to the general current of American authorities.

The rule laid down in that case, as to the effect of the repeal of a statute, is applicable only to statutes giving penalties and conferring jurisdiction.

Where an act of the legislature contemplates the taking of private property for public use, and makes provision for the payment of damages, the constitution requires that if any damages are sustained by individuals, by the taking of their property, compensation shall be made; and any subsequent act of the legislature, which tends to deprive such individuals of compensation, is void as being a violation of the constitution.

The public use of a highway being but an easement, subject to which the owner of the land over which it passes retains his title, there is always a contingency by which the owner may return into the full possession of the land, on its being no longer required by the public. When this contingent event will happen is ordinarily unknown, and is wholly immaterial, as regards the rights of the land holder. Whether the public retains the use of the land for a century, or for a year, or but for a single day, cannot affect his title to a compensation. That becomes fixed, and vested, the instant his property is taken for public use.

DEMURRER to the defendants' return to an alternative mandamus. By the act passed May 13th, 1845, entitled "an act to improve the post road running from the Elephant Hotel in the town of Somers to the village of Peekskill," commissioners were appointed to alter and improve said road ; and in so doing to make a survey and examination of the same, or such parts thereof as in their opinion it should be proper or necessary to alter, in order to avoid or reduce hills, or to straighten and shorten said road, and to cause a map and description "of so much of the changes of route and alterations of the said road, as shall be in each and every town through which the same passes, to be filed in the office of the town clerk of the town in which such part of said road shall lie, whose duty it shall be to record the same in like manner as he is required by law to record the orders of commissioners of highways in laying out public highways." (*Laws of* 1845, *p.* 222.) The fourth section provided that "the damages sustained by any owner or occupant of land, by reason of any such alteration or changes of route shall be ascertained, levied and paid ; and the said road shall be districted, opened, worked and improved, in the manner prescribed in the first title of the sixteenth chapter of the first part of the revised statutes." The act also empowered the commissioners to apply for process to ascertain the damages, and to direct and make contracts for the cutting down hills on the said road, and to superintend the work. The fifth section declared that the expenses of making said alterations should be apportioned upon the towns of Somers, Yorktown and Cortland, in proportion to the length of the parts of the road so altered, lying in said towns respectively, to be levied and collected as other contingent charges of said towns are by law directed to be levied and collected.

Under and by virtue of this act certain improvements were laid out by the commissioners for that purpose appointed in and by such act, in that part of the said road situated in the town of Cortland, and passing through the enclosed lands of the relators, and the damages sustained by the relators by reason of such improvements, were duly assessed by a jury, in the

The People *v.* The Supervisors of Westchester.

manner provided for by said act. And such damages were afterwards liquidated and settled by the board of supervisors, at their annual meeting in November, 1845. Subsequently, in pursuance of written notices served upon them by the said commissioners, the relators proceeded to remove their fences from within the bounds of the improvements and alterations, in the manner required by law. By virtue whereof the relators were, as they claimed, entitled to have their damages, thus assessed and liquidated, paid to them, respectively. But the board of supervisors refused to order and direct such damages to be raised and paid to the relators, or either of them. Whereupon the relators applied for, and obtained, an alternative mandamus requiring them to cause such damages to be levied and collected and paid to the relators, respectively, or to show cause to the contrary. By the return of the defendants to the alternative mandamus, it appeared that the commissioners entered upon their duties in June, 1845, and laid out, by designating several alterations and improvements in the said road, in the town of Cortland, running through the enclosed lands of the relators; that their damages were assessed, pursuant to the act, on the 28th day of August, 1845; that appeals were taken from said assessments, and the board of supervisors, at their meeting in November, 1845, liquidated and settled the said damages, by confirming the assessment of the jury in three of the cases, and reducing the amount in the other two; that the said board did not order any part of the said damages to be paid; that petitions were received by said board requesting them to delay further action thereon until an application could be made for a repeal of said act; that the relators, in pursuance of written notice served on them by said commissioners, proceeded to remove their fences from within the bounds of said alterations and improvements, but that no notice was served by the commissioners of highways. On the sixth day of May, 1846, the legislature passed an act repealing the act of the 12th of May, 1845, with certain reservations and qualifications. (*Laws of* 1846, *p.* 144.)

At the annual meeting of the board of supervisors in Novem-

The People *v.* The Supervisors of Westchester.

ber, 1846, the relators presented a petition praying that their damages might be directed to be raised pursuant to said act. The board refused to comply with the prayer of said petition, and in their return assigned as their reasons for such refusal, in addition to the foregoing, the following: That the assessment included the value of land of which the complete title remained in the relators; that the assessment included the damages for cutting off water courses, &c. none of which damages are or would be actually sustained: and for removing fences which were not necessarily removed, as no legal notice was given; that the repealing act rendered it impossible to proceed with said alterations of the road; and that if the action of the commissioners and others with the relators could be construed into an agreement to take the land and pay for it the damages assessed as aforesaid, it was a contract which the act of May 6th, 1846, rendered it impossible for them to fulfil. The relators demurred to this return.

After the return was made, the legislature, on the 17th November, 1847, passed an act amending the act of repeal, by adding to the second section thereof the following words, viz: "all the proceedings had and taken, for, and by which the assessment of the said damages sustained by the respective owners of the lands through which the said alterations and changes of route have been laid out or designated by the said commissioners, under and in pursuance of the act hereby repealed, by reason of the laying out of said alterations and changes of route and deviations, are hereby annulled and declared to be and are of no virtue, force or effect whatever, in law or equity, and the damages so assessed, if any have been assessed, shall not be sued for, or recovered, in any court of law or equity." (*Laws of* 1847, *p.* 480.)

*E. Wells,* for the relators. I. The damages of the relators having been regularly assessed, and liquidated and determined in the mode pointed out by the act of May 13th, 1845, it thereupon became the duty of the board of supervisors to order such damages to be raised and paid. And the petitions to the con-

trary, referred to in the return, did not justify the board in delaying or refusing so to do. (*Act of May* 13*th*, 1845, § 4. *Sess. Laws of* 1845, *ch.* 193, *p.* 223. 2 *R. S.* 511, 512, § 70. *Johnston* v. *Superv. of Herkimer*, 19 *John.* 275. *People ex rel. Parish* v. *Sup. St. Lawrence*, 5 *Cowen*, 292. *People* v. *Corp. of Brooklyn*, 1 *Wend.* 318, 323, 325. 1 *Chitty's Pl.* 232, *ed. of* 1840.) II. The right of the relators to their damages depended on the assessment and liquidation of the damages, and not on the opening of the road; but if it were otherwise, the commissioners had power to give the notice to open the road; or the land owners, if they chose, might remove their fences without any notice so to do. (*Case* v. *Thompson*, 6 *Wend.* 637. *Laws of* 1845, *p.* 223, § 4. 1 *R. S.* 512, § 70, 2*d ed.* 19 *John.* 275. 5 *Cowen*, 292. 1 *Wend.* 59. *King* v. *Mayor of Abington*, 1 *Ld. Raym.* 559.) III. The assessment of the damages, and the liquidation and settlement thereof by the board of supervisors, in the manner pointed out by law, gave the land owners a vested right, by contract with the public, to the sums awarded as damages, which right no subsequent act of the commissioners, supervisors or legislature could divest, without the consent of the land owners. The repealing acts of May 6th, 1846, and November 17th, 1847, are not to be construed to affect the land owners, by divesting their right to damages; but if they are intended so to affect them, those acts are unconstitutional and void. (*Case of Dover-street*, 18 *John.* 506. *Case of Beekman-street*, 20 *Id.* 269. 6 *John. Ch. Rep.* 49, 50. 1 *Black. Com.* 139. *Const. U. S. art.* 1, § 10, *sub.* 1. *Const. N. Y. art.* 7, §§ 1, 7. *Stafford* v. *Mayor, &c. of Albany*, 6 *John.* 1. *S. C.* 7 *Id.* 541. *Case of Third-street, N. Y.* 6 *Cowen*, 571. *Hawkins* v. *Trustees of Rochester*, 1 *Wend.* 54. *Dash* v. *Van Kleeck*, 7 *John.* 477, 484, 513. *Puff. L. of N. & N., B.* 1, *ch.* 6, § 6. *Grotius, Lib.* 2, *ch.* 11, § 1, (3). *Code, Lib.* 1, *tit.* 14, *law* 7. *Rutherf. Inst. ch.* 12, § 9, *p.* 91. *Dig. Lib.* 50, *tit.* 17, *law*, 75. *Gael on Legal & Gen. Comp. p.* 224, *ch.* 17, § 5, (*Repeal.*) *Harrington* v. *Com. of Berkshire*, 22 *Pick.* 263. *Fletcher* v. *Peck*, 6 *Cranch*, 87 *to* 148. *Whitbeck* v. *Cook*, 15 *John* 483. *Cortelyou* v. *Van Brundt*,

2 *Id.* 357. *Lambert* v. *Hoke*, 14 *Id.* 483. *Gidney* v. *Earl*, 12 *Wend.* 98.) IV. The rights of the relators not having been affected by the repealing acts of May 6th, 1846, and November 17th, 1847, and the money not having been paid to them, they are entitled to a peremptory mandamus, requiring the respondents to order the money to be raised and paid.

*John Van Buren*, for the defendants. The inhabitants of the towns through which the road passed petitioned the board at its session in November, 1845, to delay acting further on the assessment until the legislature could be petitioned to repeal the act ; and the board at that session laid the matter on the table for further consideration ; without deciding whether or not they would levy the taxes. The relators have never been deprived of the title, possession, or enjoyment of their land ; never having received legal notice to remove their fences ; as such notice should have come from the commissioners of highways of the town of Cortlandt, and not from the commissioners appointed by the act. (*Laws of* 1845, *p.* 222. 1 *R. S.* 517, 2*d ed.* 2 *Cowen,* 42.) The act provided " that damages by reason of any alteration or change of route" should be paid, but no alteration or change of route has been made. The act authorizing these alterations was repealed by an act passed May 6, 1846, by which all proceedings under the first act were wholly and absolutely annulled and vacated. (*Laws of* 1846, *p.* 144. 2 *Hill,* 238. 15 *John.* 358.)

In consequence of such repeal the board of supervisors could not, when the petition of the relators was presented to them in November, 1846, order such assessments to be raised and paid to the relators, nor can they now. (*Dwar. on Stat. part* 2, *p.* 676. 1 *Hill,* 324. 23 *Wend.* 458.) The relators have sustained no damage ; as they have not been deprived of any part of their land, nor cut off from any water, nor forced to build any fence, nor injured in any other way, as the proposed road has never been opened or worked. A mandamus is a prerogative writ which the court have power to issue or withhold at their discretion : and it would not surely be either fair or dis-

creet to make this town pay $3115 for nothing, and to persons who have sustained no injury. By the act passed November 17, 1847, the proceedings for assessing these damages are annulled and declared to be of no virtue, force, or effect whatever in law or equity ; and it is declared that the damages so assessed shall not be sued for or recovered in any court at law or in equity.

*By the Court*, BARCULO, J. The question arises whether the board of supervisors can be compelled by mandamus to direct the levy and collection of the damages assessed to the relators under the act of 1845. In discussing this question, I shall assume that a mandamus is the proper remedy for the enforcement of the relators' rights, if any they have; and that their rights are cut off and annulled by the repealing acts, *if the legislature had the power thus to cut them off.*

The case then involves the consideration of the following propositions : I. The general power of the legislature to destroy vested rights by a repeal of the statute under which they were acquired. II. How far the repealing acts in question conflict with the provision of the constitution of this state which forbids the taking of private property for public use, without just compensation. III. How far they fall within the inhibition contained in the constitution of the United States against passing laws impairing the obligation of contracts.

I. By the theory of the English government, the law-making power is omnipotent. An act of parliament in plain and distinct terms, however unjust or oppressive, is binding upon individuals and courts of justice. It is the supreme law of the land, and demands perfect obedience. It has been said by an eminent jurist of this country, that, " if there be no constitutional objection to a statute, it is with us as absolute and uncontrollable as laws flowing from the sovereign power, under any other form of government." (1 *Kent's Com.* 448.) In its broad and unlimited sense, I cannot subscribe to this doctrine, as applicable to republican governments. Here the legislature is not supreme ; it is not the highest authority recognized. "It

The People *v*. The Supervisors of Westchester.

is only one of the organs of that absolute sovereignty which resides in the whole body of the people. Like other departments of government, it can only exercise such powers as have been delegated to it; and when it steps beyond that boundary, its acts, like those of the most humble magistrate in the state, who transcends his jurisdiction, are utterly void." We have written constitutions which limit and control the legislative power: and although, in the absence of a constitutional inhibition, the legislature may be presumed to have the power it exercises, in most cases, still I apprehend that this is not universally true. The constitution declares that " the legislative power of this state shall be vested in a senate and assembly." This is the authority under which our legislature acts; and under this clause it has the power of legislation within the fair scope of legislation, except so far as it is restricted by other provisions of the constitution. But it can hardly be said that under this general power of legislation it is omnipotent: that it can pass acts against natural right and justice, and subversive of decency and good order. Such power is the prerogative of despotism—not of free government. To suppose that the people have clothed their representatives with absolute and despotic power, under the general grant of legislative authority, is to presume them incapable of self-government and unworthy the name of freemen.

Protection to life, liberty, and property, is the great object of human governments. Whatever tends to this end is within the scope of legislative authority : whatever plainly destroys this, is beyond its legitimate scope. The legislature has full power to enact laws for the punishment of crimes : but suppose it should prescribe a uniformity of dress, or the quantity and quality of food for each person, or regulate the hours which every citizen should devote to labor and to sleep ; and, attempt to enforce such arbitrary interference with individual affairs, by pains and penalties; would such laws be valid? Could any court be found to enforce them ? I am aware that these may be called " extreme cases ;" and that it cannot be presumed that the representatives of the people will so far forget their

position, as to enter upon such fields of unauthorized legislation ; still, experience warns us not to be too sanguine even upon this point. The past admonishes us of the necessity of guarding individual right against the encroachments of the law-making power. Our records show that several instances have occurred, within a few years, of laws being made in violation of the express provisions of the constitution. ( *Warren* v. *The People,* 2 *Denio,* 272. *Quackenbush* v. *Danks,* 1 *Id.* 128.)

It cannot be denied that *excessive legislation* is the great legal curse of the age. It is the mighty vortex which is drawing every thing within its grasp. So long as it keeps within the constitutional bounds and legitimate scope of its authority, it is our duty to enforce the laws : but when it transcends these, it is equally our duty to declare them null and void. (*Kent's Com. lect.* 20.) As this doctrine, limiting the omnipotence of the legislative power, by judicial interposition, has been recently denied by a learned member of the court of errors, in the case of *Cochran* v. *Van Surlay,* (20 *Wend.* 382,) it may be well to see how it stands upon authority.

In *Gardner* v. *The Village of Newburgh,* (2 *John. Ch.* 162,) Chancellor Kent had occasion to discuss the power of the state to take private property for public purposes without making recompense therefor : and he held that this power could not be legally exercised, and accordingly granted an injunction restraining the defendants from proceeding under the act, until it should be so amended as to give the plaintiff a just compensation for his property. This it will be remembered was in the absence of any *constitutional* restriction : as the first incorporation of that principle into our state constitutions was in 1821. In his commentaries, this eminent jurist reviews the American authorities on this subject, and declares that the principle exists with stringent force, independent of any positive constitutional provision, " and is laid down by jurists as an acknowledged principle of universal law." (2 *Kent's Com.* 339, *and note.*)

In *Bradshaw* v. *Rogers,* (20 *John.* 103,) Chief Justice Spencer declared that the taking of private property without making

compensation was contrary to a great and fundamental principle of government; and any law violating that principle must be deemed a nullity, as it is against natural right and justice. Although the decision in this case was reversed, it was upon a ground that left this doctrine undisturbed. In *Varick* v. *Smith,* (5 *Paige,* 137,) Chancellor Walworth says, "In a state which is governed by a written constitution, like ours, if the legislature should so far forget its duty, and the natural rights of an individual, as to take his private property and transfer it to another when there was no foundation for a pretence that the public was to be benefited thereby, I should not hesitate to declare that such an abuse of the right of *eminent domain* was an infringement of the spirit of the constitution; and, therefore, not within the general powers delegated by the people to the legislature." (*See also the remarks of the Chancellor in Beekman* v. *The Saratoga and Schenectady Rail-Road Company,* 3 *Paige,* 45; *and in Bloodgood* v. *Mohawk and Hudson Rail-Road Company,* 18 *Wend.* 9.) In *Clarke* v. *Van Surley,* (15 *Wend.* 435,) Justice Bronson alludes to this subject in these words: "Whether, upon general principles, such a law would not be void, *as beyond the scope of legislative power,* need not now be discussed." But in *Taylor* v. *Porter,* (4 *Hill,* 140,) the same learned judge discusses the effect to be given to the general grant of legislative power by art. 1, sec. 1 of the constitution, and concludes by saying, "If there was not one word of qualification in the whole instrument, I should feel great difficulty in bringing myself to the conclusion that the clause under consideration had clothed the legislature with despotic power: and such is the extent of their authority, if they can take the property of A., either with or without compensation, and give it to B. The legislative power of this state does not reach to such an unwarrantable extent. Neither life, liberty nor property, except when forfeited by crime, or when the latter is taken for public use, falls within the scope of the power. Such, at least, are my present impressions."

The same principle has been repeatedly recognized by the judges and courts of the United States. Judge Story speaks

of it in his *Commentaries on the Const. U. S.* § 1784, as a great doctrine established by the common law for the protection of private property, and as indispensable to a free government. And at section 1393 he says, " it seems to be the general opinion, fortified by a strong current of judicial opinion, that since the American revolution no state government can be presumed to possess the transcendental sovereignty, to take away vested rights of property ; to take the property of A. and transfer it to B. by mere legislative act. That government can scarcely be deemed to be free where the rights of property are left solely dependent upon a legislative body, without any restraint." Again, in *Wilkinson* v. *Leland,* (2 *Peters,* 657,) the same learned judge holds the following language : " The fundamental maxims of a free government seem to require that the rights of personal liberty and private property should be held sacred. At least no court of justice in this country would be warranted in assuming that the power to violate and disregard them—a power so repugnant to the common principles of justice and civil liberty—lurked under any general grant of legislative authority, or ought to be implied from any general expressions of the will of the people."

So in the case of *Bonaparte* v. *The Camden and Amboy Rail-Road Company,* (1 *Baldwin's C. C. Rep.* 205,) the court say " it is an incident to the sovereignty of every government, that it may take private property for public use ; of the necessity or expediency of which, the government must judge, but the obligation to make just compensation is concomitant with the right. ( *Vattel,* 112. *Ruth.* 43. *Burl.* 150. *Puff.* 829. *Gro.* 333.) The obligation attaches to the exercise of the power, though it is not provided for by the state constitution, or that of the United States."

The supreme court of South Carolina, in 1792, set aside an act of the colonial legislature, which took away the freehold of one man and gave it to another without compensation, although the act was not prohibited by any express constitutional provision. They declared the act to be void, as being against common right. ( *Bowman* v. *Middleton,* 1 *Bay,* 252. *See also*

*Dash* v. *Van Kleeck,* 7 *John. Rep.* 477 ; *Osborn* v. *Huger,* 1 *Bay,* 179 ; *Ogden* v. *Blackledge,* 2 *Cranch,* 272 ; *Bedford* v. *Skilling,* 4 *Serg. & Rawle,* 401 ; *Brunswick* v. *Litchfield,* 2 *Greenl.* 28.) In *The University of Maryland* v. *Williams,* (9 *Gill & John.* ——,) the court held an act of the legislature void as impairing the obligation of contracts and as *opposed to the fundamental principles of right and justice inherent in the nature and spirit of the social compact.*

The counsel for the defence cited *Butler* v. *Palmer,* (1 *Hill,* 324,) as to the effect of the repeal of a statute. This court there decided that the act of April 18, 1838, repealing the act authorizing the redemption of mortgaged premises within one year after a sale, passed May 12, 1837—the repeal to take effect on the first day of November, 1838—cut off the right to redeem beyond that day, although the year had not expired. This decision was upon the ground that the repealing act was in the nature of a statute of limitations, affecting the remedy only, and therefore without the constitution. It might have been put upon the ground of the unconstitutionality of the original act. (*Bronson* v. *Kenzie,* 1 *How. U. S. Rep.* 311.) So far, however, as the reasoning in that case may tend to the conclusion that a repeal can divest rights and interests in property which have become vested under a statute, it was unnecessary to the decision, and runs counter to the general current of American authorities. But even in that case Justice Cowen admits that " a right carried into judgment, or taking the form of an express executory contract under a repealed statute might stand ;" an admission broad enough, I think, to cover the present case.

My conclusion is that, upon principle, as well as upon authority, a legislative act, whether it be a positive enactment or a repealing statute, which takes away the vested rights of property of an individual for any purpose (except where property is taken for public use *and* upon a just compensation,) is to be adjudged invalid, as being above the power, and beyond the scope, of legislative authority.

In the case before us, the commissioners proceeded, under

the act of May 13, 1845, to lay out and designate the several alterations in the road : and in August, 1835, the damages of the relators were regularly assessed. In November following, the verdicts were laid before the boards of supervisors, who, after examining into the matter and reducing the amount of the assessment in three cases, finally settled the amount of damages due to the relators respectively, pursuant to 1 *R. S.* 516, §§ 69, 70. It then became the duty of the board to cause such damages to be levied and collected in the town in which that portion of the road was situated. (§ 70.) Instead of doing so, the matter was delayed until the legislature repealed the act. Now, as I view this subject, when the supervisors liquidated the amount of the damages, the relators obtained a vested right to the sums awarded to them respectively. It was such a right as this court has enforced by mandamus. (5 *Cowen*, 292.) It was a right as clear and as valid as if they had held bonds against the county for those amounts. It was a right which could be sold, assigned and transferred ; and which, by our practice, could have been reached by a creditor's bill, or by proceedings under the non-imprisonment act, and applied in the payment of a judgment.

If an authority is necessary on this point, the case of *Harrington* v. *The County Commissioners of Berkshire*, (22 *Pick.* 263,) may be deemed such. There the county commissioners laid out a highway and passed the usual orders for making it, and the owner of the land, over which it was laid out, obtained a verdict for his damages, which was accepted by the court of common pleas and certified to the commissioners: but before the proper time arrived for granting an order on the county treasury for the payment of such damages, measures were taken to discontinue the highway, and soon after an order was passed to discontinue it, and the land was never entered upon. The commissioners refused to give the owner an order for the payment of the damages found by the verdict. He thereupon applied to the court for a mandamus. The court held that he had a *vested right* to such damages, and was entitled to a writ of mandamus to compel the commissioners to order the pay-

The People *v.* The Supervisors of Westchester.

ment thereof. Chief Justice Shaw, in delivering the opinion of the court, says, "when the highway is once completely established, and the damages to the land once settled by the modes pointed out by law, the right of the public to a perpetual easement in the land for a highway, till the public shall see fit for any cause to discontinue it, becomes complete, and the right of the owner to his damages or compensation for the lien or qualified right acquired by the public in his land becomes vested." The case before us is stronger in favor of the right than the one above cited, in two particulars. *There* no possession of the land was taken; *here* the relators removed their fences and gave up the land to the public. *There* the day of payment had not arrived when the highway was discontinued; *here* the time for payment had elapsed long before the proceedings were discontinued by the repealing acts.

It may not be improper here to refer to the peculiar nature of the proceedings before the supervisors, under our statute, relative to these assessments. The board is to examine into the principles of the assessment, and their determination is termed a *final settlement* of the amount to be allowed, from which there is no appeal. The better opinion seems also to be that this is the only tribunal for liquidating the claim. It is, at least, doubtful whether any action at law will lie against the county, by which a judgment can be obtained; and if a judgment at law could be obtained, there would be no mode of collecting it, except by mandamus. These considerations would seem to give the decision of the board of supervisors, on the final settlement of the amount, something of the character of a *judgment;* and if so, the repeal could not divest the relators' rights, even according to the rigid rule laid down in *Butler* v. *Palmer*, which I consider applicable only to statutes giving penalties and conferring jurisdiction.

In the case of penal statutes, it is conceded that a repeal destroys the penalty, although suits are pending for its recovery. The reason is plain; the penalty, in theory at least, is due to the public, by way of punishment for some offence; and therefore the legislature, as the organ of the public will, has an un-

doubted right to remit. (*State of Maryland* v. *Baltimore and Ohio Rail-Road,* 3 *How.* 354.)    But even in such a case, where the penalty is to benefit an individual, it seems, from a decision in a neighboring state, that a *judgment* vests it, beyond the power of a repeal. (*Oriental Bank* v. *Freeze,* 6 *Shepley,* 109.)

II. I will next briefly consider the objection to the validity of the repealing acts, founded upon that clause in the constitution of the state which forbids the taking of private property for public use, without just compensation. The view taken of the first point, renders it unnecessary to examine this at length.

The original act plainly contemplated the taking of property under this clause, and accordingly it made provision for the payment of damages. Hence it follows that if any damages have been sustained, or in other words, if any property of the relators has been taken, the constitution requires that compensation should be made; and any subsequent act of the legislature, which tends to deprive them of compensation, is void. From the return it appears, that after the alterations were laid out and designated, by the commissioners, the relators removed their fences and gave up a portion of their lands to the public use. That this was done pursuant to notice given by the commissioners appointed by the act, and not by the commissioners of highways, cannot in any degree impair its effect. The relators thereby became entitled to a just compensation; the amount of which was determined by the jury, and board of supervisors. The repealing acts then come in and declare that this joint compensation shall be withheld, and " shall not be sued for or recovered in any court of law or equity." That this is a palpable violation of the constitution cannot, I think, for a moment be doubted.

It is urged for the defence that the contemplated alterations of the road were abandoned, and that therefore the damages assessed were not in fact sustained, but the property, in substance, was restored to the relators. It is very possible that this consideration might have authorized the legislature, so far as this constitutional question is concerned, to incorporate in the repealing act a provision for a *reassessment* of the damages

which had been actually sustained. But that was not done. The repeal is total, and is accompanied, not by the usual clause saving the rights acquired under the first act, but by a most unequivocal and extraordinary attempt to destroy the rights secured to the land owners by the original act, and guaranteed by the constitution.

It is to be borne in mind, that the public does not obtain the fee of the lands over which highways pass. The public use is but an easement, subject to which, the owner retains his title. There is, therefore, always a contingency by which the owner may return into the full possession of the land, on its being no longer required by the public. When this contingent event will happen is ordinarily unknown, and wholly immaterial, as regards the rights of the landholder. Whether the public retains the use of it, for a century, or for a year, or but for a single day, cannot affect his title to a compensation. That becomes fixed and vested, the instant his property is taken for public use.

III. In regard to the third point, the argument on the part of the relators may be thus stated : A contract is a compact between two or more parties. A state cannot, by mere legislative act, make a contract, in the ordinary acceptation, although it may authorize its agents to enter into a final contract. The state may however, by enactment, make that which is equivalent to a contract, as by conferring a charter or grant, in which, although there are no words of covenant, there is an implied agreement that the rights given shall not be destroyed nor the grant resumed. If the act is in the nature of an *executed* contract, whatever rights are created cannot be impaired by subsequent legislation. If the law is in the nature of an *executory* contract, and is supported by a sufficient consideration, it cannot be annulled by the legislature. If however, the act contemplates some further action on the part of the state or its agents as the consideration or execution, then it may, prior to such action be repealed. The law of 1845 authorized the agents of the state to take the property of the relators, and provided a constitutional compensation. It was equivalent to an agreement on the part of the state to take as

much of the property as might be necessary for the public use, and to pay the owners such damages as should be assessed by a jury. The assent of the owners is *compelled*, in which respect it differs from a contract between individuals. The transaction is in the nature of an *executory* contract *forced* upon the relators by the state. Before any further action, the law might have been repealed, and things would have been in *statu quo ;* but as soon as the commissioners proceeded to take the land, a consideration passed, rights accrued, and the contract became sacred, in the view of the federal constitution. The legislature says to the owners, " we will take your land and pay you for it." They may change their intentions before the land is taken ; but after the land is taken, the contract is so far executed as to be unrepealable, as to those whose rights are affected. This reasoning seems to be, to some extent, sustained by the following authorities : (*Fletcher* v. *Peck*, 6 *Cranch*, 87. *New Jersey* v. *Wilson*, 7 *Id.* 164.  *Terrett* v. *Taylor*, 9 *Id.* 43. *Dartmouth College* v. *Woodward*, 4 *Wheat.* 518.  *People* v. *Platt*, 17 *John. Rep.* 195.  *Trustees of the Bishop's Fund* v. *Rider*, 13 *Conn.* 87.)

It is, however, unnecessary to discuss this subject more fully, or to express a more decided opinion upon this point. We are all disposed to place our decision mainly upon the first ground.

The relators are entitled to judgment on the demurrer, with costs, and to a peremptory mandamus.

New-York Special Term, July, 1848.  *Edwards,* Justice.