Ranney, J.,
dissenting: — These cases are petitions in error, prosecuted in this court to reverse the judgments of the court of common pleas of Wayne county, affirming the defendants in error to have been duly elected to county offices, at the general election on the second Tuesday of October, 1863. The material facts in all the cases are the same, and they have been heard and considered together. Of the legal votes polled in the county of Wayne, or elseAvhere in the stare of Ohio, it is conceded the defendants had a majority for the offices which they respectively claim; but if to these are added the votes polled in other states by electors of that county, absent from their places of residence in the military service of the United States, it is further conceded that the majorities are changed, and if these votes were legally given the plaintiffs in error were duly elected to these offices.
I have no doubt of the power of this court to review these decisions; and, passing by, without the expression of any opinion, most of the questions raised upon the argument, and assuming .the act of April 13, 1863, to have been intended, to authorize this extra-territorial voting, I shall confine myself to the question, whether, upon such a construction of its provisions, it is consistent with the constitution of the state. It is impossible to overrate the importance of this question. I have approached it with extreme reluctance, and nothing short of the high duties which this place imposes, would now induce me to record my dissent from the conclusions of my brethren, for whose opinions I entertain the highest respect. If I am still in error, it does not arise from any want of the most mature consideration. The question has been several times argued with distinguished ability, and I have again and again bestowed upon it the careful attention which its importance required; and the more I have investigated and reflected, the more thoroughly I have been brought to the absolute conviction, that such voting undermines the very foundation-principles upon which the constitution has founded the exercise of the elective franchise; deprives elections of all the restraints and protection of law, and opens a very wide door to the in *615 troduction of those frauds which, through the violence of parties and the greed of individuals for the emoluments and distinctions of office, continually beset this institution. Whether I am right or wrong, I think there will be no difficulty in un* derstanding the grounds upon which my conclusions are based. I shall simply invoke the application of a few familiar and perfectly well-settled- rules of construction to the language of the constitution itself, and shall only insist upon giving its provisions the operation and effect which it was understood they should have by those who framed and adopted the instrument.
But, before proceeding to a particular examination of the provisions of the constitution, and of the act drawn in question, it may not be improper, if not indispensably necessary, to dispose of a preliminary proposition. In the course of the argument, it has been many times asserted that no express prohibition upon the power of the general assembly to authorize elections to be held outside of the limits of the state, is to be found in the constitution; and that, in the absence of such prohibition, the power must necessarily exist. It is undoubtedly true, that no such express prohibition exists; and if it is further true, that the general assembly, in the absence of express prohibition, is invested with all the powers' -of sovereignty which belong to the people, and may exercise them at any time, and in all places, the conclusion drawn might be quite irresistible. But it is entirely clear that the general assembly is invested with no such unlimited and despotic authority ; and it is difficult to conceive of a doctrine more directly at variance with the genius and spirit of our institutions, or more explicitly negatived by the decisions of this court, as well as those of other states, and by the constitution itself.
The subject, however, is-too far incidental to the main purposes of this opinion to admit of a full exposition in all its bearings; and it may be sufficient to say, that this court, in the case of the Cincinnati W. & Z. R. R. Co. v. The Commissioners of Clinton Co., 1 Ohio St. Rep. 78, has unanimously declared, that the “ authority of the general assembly is much *616 too broadly stated when it is claimed that all their acts must be regarded as valid which are not expressly prohibited by the constitution;” that, “like the other departments of government, it exercises only delegated authority; ” . . . “ that any act passed by it, not falling fairly within the scope of legislative power, is as clearly void as though expressly prohibited ; ” and that “ it 'is always legitimate to insist that any legislative enactment, drawn in question, is void, either because it does not fall within the general grant of power to that body, or because it is expressly prohibited by some provision of the constitution.” And the court gave its unqualified adhesion to the doctrine of the supreme court of Pennsylvania, in the case of Parker v. The Commonwealth, 6 Barr, 511, that “ it is this species of insidious infraction that is more to be feared and guarded against, than direct attacks upon any particular principle proclaimed as a part of the primordial law;"for attempts of the latter description will, generally, be met by instant reprobation; while the stealthy, and frequently seductive, character of the former is apt to escape detection, until the innovation is made manifest by the inflic tion of some startling wrong.” . These are no new doctrines. They were most emphatically declared, and distinctly applied, by the late court in bank, in the case of Bingham v. Miller, 17 Ohio Rep. 445. The question arose upon an act of the legislature granting a divorce. In denying the constitutional power to pass such acts, the court say: “ The constitution confers no such power. The legislature is not'sovereign; nor are all the departments of government combined. The people only'are sovereign. Nor can the matter be helped out by implication; for the constitution, in express terms, declares that “all powers not hereby delegated remain with the people.” The legislature, then, as well as the other departments of state, possesses only a delegated power, and can exercise no powers not delegated. The constitution confers no power to grant divorces ; from whence, then, can the legislature derive it? Not, like the British parliament, from sovereignty, because the legislature does not possess it; not from the constitution, because *617 it does not confer it.” And after proceeding to state that the power is judicial in its nature, they add: “ Thus, the legislature, in granting divorces, have not only assumed a power not •delegated to them, but have usurped a power expressly conferred upon the judiciary.” It is thus made apparent that the supreme court of this state, under the former organization, as well as the present, has, in unanimous opinions, distinctly repudiated the position that every legislative enactment which is not expressly prohibited, must be held valid and binding.
The cases in other states, and in the supreme court of the United States, are equally explicit. It is both unnecessary and impracticable to enter upon a detailed examination of them. It is sufficient to say, that many of the most eminent jurists who have adorned our judicial annals, have expressed similar opinions; and to refer briefly to. the cases of Taylor v. Porter, 4 Hill, 140; Rogers v. Bradshaw, 20 J. R. 735; People v. Platt, 17 J. R. 195; Varick v. Smith, 5 Paige, 137; People v. Supervisors, etc., 4 Barb. 64; Benson v. Mayor of New York, 10 Barb. 223; Powers v. Bergen, 2 Seld. 358; People v. Edmonds, 15 Barb. 229; Calder v. Bull, 3 Dall. 386; Wilkinson v. Leland, 2 Pet. 627; Hatch v. Vermont Central R. R. Co., 25 Vt. R. 49; Railroad Co. v. Davis, 2 Dev. & Bat. 451. In the case of Taylor v. Porter, Chief Justice Bronson said: “ Under our form of government the legislature is not supreme. It is only one of the organs of that absolute sovereignty which resides in the whole body of the people. Like other departments of the government, it can only exercise such powers as have been delegated to it; and when it steps beyond that boundary, its acts, like those of the most humble magistrate in the state who transcends his jurisdiction, are utterly void.”
In Varick v. Smith, Chancellor Walworth, instancing a legislative enactment which transferred the private property of one person to another, declares that he “ should not hesitate to declare such an abuse of the right of eminent domain an infringement of the spirit of the constitution, and therefore not within the general powers delegated by the people to the *618 legislature.” And Mr. Justice Barculo, in a similar case, says that such an enactment ought “to be adjudged jnvalid as being above the power and beyond the scope of legislative authority;” and upon a subsequent occasion he declared that the rights of parties, in such cases, “ rest not merely upon the constitution, but upon the great principles of eternal justice, which lie at the foundation 'of all free governments.” In the case-of Powers v. Bergen, decided by the court of appeals, Mr. Justice Jewett, in delivering the opinion, said: “ Here the sovereign and absolute power resides in the people, and the legislature can only exercise such powers as have been delegated to it.” In the case of Calder v. Bull, in the supreme court of the United States, Mr. Justice Chase says: “I can not subscribe to the omnipotence of a state legislature, or that it is absolute and without control, although its authority should not be expressly restrained by the constitution or fundamental law of the state. . . An act -of the legislature (for.I can not call it a law) contrary to the great first principles of the social compact, can not be considered a rightful exercise of legislative authority.” And Mr. Justice Story, in Wilkinson v. Leland, holds this language: “ The fundamental maxims of a free government seem to require that the rights of personal liberty and private property should be held sacred. At least no court of justice in this country would be warranted in assuming that the power to violate and disregard them — a power so repugnant to the common principles of justice and civil liberty — lurked under any general grant of legislative authority, or ought to be inferred from any general expressions of the will of the people.”
But this line of examination seems almost unnecessary in the light of the express language of the constitution of this state. By the last section of the bill of rights it is declared that “this enumeration of rights shall not be construed to impair or deny others retained by the people; and all powers not herein delegated remain with the people.” No language more pertinent and expressive could have been employed to express the sense of those who framed and adopted this *619 instrument that the people retained important rights not specifically'“enumerated;” that all the powers which any department or officer of the government could pretend to exercise, were derived from express delegation in the constitution; and that all other powers belonging to the people were left undelegated, and remained with them. If, therefore, any respect is due to judicial opinions, or constitutional provisions, we must dismiss the idea that the general assembly is invested with the unlimited and undefined power to do anything and everything which is not found expressly prohibited. The constitution is not framed upon that plan. It emanated from those in possession of all political power, with the perfect right to delegate as much or as little as they thought necessary for the preservation of their rights and liberties. They have only expressly prohibited the exercise of power when they wished to limit or restrain what otherwise would fall within the general terms of the delegation; and they have charged this court with the high duty of placing such a construction upon the instrument as shall equally protect them from the assumption of undelegated power, as well as the exercise of that which is expressly prohibited. In the discussions which this subject has undergone, undoubtedly expressions may be found asserting the right of the judiciary to arrest the acts of the lawmaking power when certain great principles of right and justice have been infringed, to which I am not prepared to yield my assent; but the great current of judicial opinion has been founded upon the clear line of distinction which divides delegated from undelegated authority; and, to this extent, it is wholly unassailable, and has never been disputed.
Under a constitution like ours, which, in addition to a complete frame of government, contains an extended statement of the great leading principles of liberty and justice upon which the government is founded, it can very seldom be necessary to bring legislation to any other test than that of the constitution itself. By the constitution, the powers it grants have been conferred upon three separate and independent departments — the legislative, executive, and judicial. If the *620 first should attempt to exercise powers conferred upon either of the others, its acts would be void; not because it is expressly prohibited from doing so, but because it has been invested with no such authority. Eor the same reason, if it should allow things to be done which the general principles of 'the constitution prohibit, or prohibit those that it allows; or provide for accomplishing objects in other ways, or by different agencies, than those provided in the constitution, its acts would be equally void, although these powers should be legislative in their nature, and no express prohibition could be found. The fact is, the constitution has invested no mere instrument of its creation with any authority whatever to change its distribution of powers, to undermine or impair its declared principles, or to accomplish the purposes of government by other or different.agencies than those it has provided. Although it grants, in general terms, to the general assembly “the legislative power of this state,” still the grant must be so limited as to preserve the perfect integrity of every constitutional provision, and is necessarily narrowed, not only by what is taken away by prohibition and declaration of principles, but by all that mass of legislative power which the people themselves have exercised in the constitution itself. Any other construction would lead to the most absurd results. The article upon the elective franchise will furnish a pertinent illustration. By that article, “every white male citizen’of the United States, of the age of twenty-one years,” having a prescribed residence, “ shall have the qualifications of an elector; ” but the constitution, will be searched in vain for any express prohibition upon the legislature from making other persons electors; and, unless this affirmative action of the people imports an exclusion, the general assembly might extend the privilege to minors, aliens, or negroes. No one would pretend that it possesses any such power. This court has declared, that the use of the word white “necessarily excluded those inhabitants of the state, though otherwise qualified, who were not white; ” and the supreme court of Connecticut, acting upon an enactment of the general assembly of that state, nearly *621 identical with that now under consideration, and in answer to a similar suggestion, say: “Neither in constitutions nor statutes, nor contracts, nor wills, nor in any oral directions of a superior to an inferior — as a master to a servant, or a parent to a child — do men deem it necessary to accompany an express and full direction to do a particular thing in a particular way, by an express direction not to do it in any other. Officers, civil and military, citizens, servants, and children, all understand that every such direction of a superior, carries with it an implied prohibition against doing the thing prescribed in any other way.” 2 Am. L. Reg. N. S. 470.
The principles elicited by this examination, authorize me to assume that an express prohibition is not the only test by which to try the validity of a legislative enactment; that the general assembly has been invested with no authority, and is, therefore, impliedly prohibited from passing any act which interferes in any manner, or to any extent, with the declared principles, or modes of action, prescribed by the constitution; and that no legislative act can be said to be oonsistent with the constitution which deprives electors, or elections, of any of the protections or safeguards which the people have deemed necessary to preserve the freedom and purity of the elective franchise. Before an act can be declared void for such inconsistency, I fully agree, that the repugnancy must be clear and decided. In the language of Chief Justice Marshall, in Fletcher v. Peck, 8 Cranch, 87, “the opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other.” To proceed to such a conclusion upon slight implication and vague conjecture, would be to usurp powers not conferred upon the judiciary; while a refusal to interfere, in a palpable case, upon doubts raised upon the mere structure of language, when the spirit and substance of constitutional arrangements are subverted, is to surrender one of its most important functions, and decline performance of one of the most sacred of its duties. In the language of an eminent American author: “ Constitutions, from the nature and necessity of the case, in many *622 instances go little beyond the mere enunciation of general principles; and it is impossible, and would lead to endless absurdity, to endeavor to apply to a declaration of principles the same rules that are proper in regard to an enactment of details. In regard to a statute, the general duty of the judge is that of a subordinate power, to ascertain and to obey the will of a superior; in regard to a constitution, his functions are those of a co-ordinate authority, to ascertain the spirit of the fundamental law, and so to carry it out as to avoid a sacrifice of those interests which it is designed to protect.” Sedg. on Stat. and Const. Law, 492.
In the light of these principles, and guided by these rules, I shall now proceed to a particular examination of the. provisions of the constitution relating to elections, and of the act upon which these cases depend.
In respect to every thing not expressly conferred upon the federal goArernment, nor denied by the federal constitution to the states, the political society constituting the State of Ohio, within her own territorial limits, is completely sovereign and independent. As a fundamental truth, lying at the foundation of all republican governments, and expressly declared in the constitution, “all political power is inherent in the people.” It was their' undoubted right, therefore, to provide for the choice of such ofiicers as should seem'to them necessary for the internal government of the state, through such agencies, and in such manner, as they thought proper. They have adopted the plan of constituting a body of “ electors,” whose qualifications and mode of action are clearly defined; and have devolved upon them the duty, in the manner provided in the constitution and laws, of making choice of nearly all the general and local ofiicers of the state — legislative, executive, judicial, and administrative; and, in this Avay, have created and organized the first great fundamental institution of the state government.
In the second article of the constitution it is provided, that “ senators and representatives shall be elected biennially, by *623 the electors in the respective counties or districts, on the second Tuesday of October.”
In the third, that the officers composing the executive department “shall be chosen by the electors of the state, on the second Tuesday of October, and at the places of voting for members of the general assembly;” the returns to “be sealed up and transmitted to the seat of government by the returning officers,” etc. If a vacancy occurs in the office of auditor, treasurer, secretary, or attorney general, it is to “ be filled by election, at the first general election that occurs more than thirty days after it shall have happened.”
The 4th article relates to the judiciary, and provides, that “the judges of the supreme court shall be elected by the electors of the state at large;” those of the common pleas, “by the electors of the subdivisions of the judicial districts;” of the probate court, “by the voters of the county;” and justices of the peace, “by the electors in each township of the several counties.” If a vacancy happens in the office of any judge, it is to be filled “ at the first annual election that occurs more than thirty days after the vacancy shall have happened.”
In the 10th article it is provided: “County officers shall be elected on the second Tuesday of October, until otherwise directed by law, by the qualified electors of each county, in such manner and for such term, not exceeding three years, as may be provided by law.” “Township officers shall be elected on the first Monday of April, annually, by the qualified electors of their respective townships.”
Laws authorizing associations with banking powers, are, by the 7th section of the 13th article, to be “ submitted to the people at the general election next succeeding the passage thereof.”
Amendments to the constitution, originating with the legislature, or a recommendation of that body for a convention, are to be voted upon at the “next election for senators and representatives;” and “at the general election to be held in the year 1871, and in each twentieth year thereafter, the *624 question, Shall there be a convention to revise, alter, or amend the constitution? shall be submitted to the electors of the state.” Art. 16.
And, finally, by the 17th section of the schedule, the constitution vfas directed to.be submitted, for ratification or rejection, “to the electors of the state, at an election to be held on the third Tuesday of June, 1851, in the several election districts of this state.”
The 5th article is devoted to the elective franchise, and Avas intended to furnish a full and accurate description of the qualifications of electors, and hoAV, and how only, they might exercise the great power with which the constitution invested them. The first three sections of that article, are in these words:
Seo. 1. “Every white male citizen of the United States, of the age of twenty-one years, who shall have been a resident of the state one .year next preceding the election, and of the county, township, or ward in which he resides, such time as may be provided by law, shall have the qualifications of an elector, and be entitled to vote at all elections.”
Sec. 2. “ All elections shall be by ballot.”
Sec. 8. “ Electors, during their attendance at elections, and in going to and returning therefrom, shall be privileged from arrest in all cases, except treason, felony, and breach of the peace.”
The foregoing are the leading provisions of the constitution relating to electors and elections; but a very imperfect understanding of the meaning and application of the terms employed would be obtained without referring to the previous legislation of the state, and the former constitution in force Avhen this was framed and adopted. For, as was well said by this court, in Cass v. Dillon, 2 Ohio St. Rep. 607, “ this constitution created no new state. It only altered, in some respects, the fundamental law of a state already in existence; and even this was done pursuant to the prior constitution, under whose provisions the convention was called, and the new constitution framed.” The influence of this fact is apparent in every part *625 of the instrument. It nowhere enters upon extended definitions or descriptions. Not only the great body of the legislation of the state was expressly continued in force, but its principal institutions and agencies remained the same; and whenever their powers are enlarged or restricted, or independent regulations are made in respect to them, they are simply referred to as things well understood by the people of the state. To comprehend these references, and to give the language employed its just application, we must seek for the true character of these institutions and agencies as they were actually illustrated in the legislation and practical workings of the former government; and if we would arrive at a true construction, we must continually bear in mind, that they are no further changed, in their essential features and characteristics, than is expressed in the constitution. As an indispensable aid to such a construction, I shall present some of the leading provisions of the constitution of 1802, and of the legislation under it, relating to elections. The- 2d and 3d sections of the 4th article-, providing that all elections should be by ballot, and privileging electors from arrest, are the same as the corresponding sections of the 5th article of the present constitution. The 1st section was in these words: “ In all elections, all white male inhabitants above the age of twenty-one -years, having resided in the state one year next preceding the election, and who have paid or are charged with a state or county tax, shall enjoy the right of an elector; but no person shall be entitled to vote, except in the county or district in whieh he shall actually reside at ike time of the election.”
The policy upon which these provisions were founded, as appears by our legislative records, is older than this constitution, and has been adhered to with unyielding tenacity down to the passage of the act of 1863.
By the territorial act, “to regulate the elections of representatives,” approved Dec. 9, 1800, 1 Chase Stat. 304, the-courts of quarter sessions were required to divide the counties-into election districts, and “to name a certain house” in each-district “ at which the electors within such district shall meet,. *626 when and as often as the law shall require, to vote for persons to serve in the general assembly.” After providing for the choice of judges and clerks, and their qualifications, and that “at all elections the manner of voting shall be by ballot,” the 4th section provides, that “ every elector shall, openly and in full view, deliver his ticket to one of the judges of the election, on which shall be written the name or names of the person or persons, as the case may be, for whom he votes; and the judge, on the receipt thereof, shall, with- an audible voice, pronounce the name of such voter, and, if no objection be made to the voter, and the judges be satisfied that he is a legal voter, shall put the ticket immediately into the ballot-box; and the clerks of the election shall thereupon, write ■down the name of the voter in a poll-book to be provided for sthat purpose.” The 5th section provides for the attestation ■of the poll-books, and the canvass of the ballots, and, after this ds done, declares that “the number of votes given for each ■candidate shall be carefully cast up, under the inspection of ■the judges, and be publicly declared to the people present.” In ■the 8th section it was enacted, “that no person or persons shall be allowed to vote for any representative to the general .assembly, at any other place than at the house pointed out by ■the court, within the election district wherein such voter actually resides.” At the first session of the general assembly held under the constitution of 1802, the act of April 15,1808, “to ■regulate elections,” was passed. 1 Chase, 364. By this act ■it was provided, “that each township now or hereafter to be ■erected in the several counties, shall compose an election district;” and the court of common pleas was required “to name a certain house in each,” where the electors should “meet,” and hold all state, county, and district elections. The provisions for the organization of the election boards, and for receiving and canvassing the ballots, with a public proclamation of the result, was substantially the same as in the territorial act; and it was also "provided, that “no elector shall wote except in the township in which he resides.”
/'General revisions of the statutes regulating elections were *627 made in 1809 (1 Chase, 622), in 1820 (2 Chase, 1093), in 1824 (2 Chase, 1259), and in 1831 (3 Chase, 1663). By these several revisions the trustees of townships were required to* designate the place in each township for holding the election, and to act as judges; but all the other provisions of the act of 1803, to which I have called attention, were substantially, and in most instances literally, re-enacted; except, that, in the section of the act of 1831, which required the elector to vote in the township of his residence, a proviso was added allowing him to vote for state and county officers in any other township of the same county where he might be actually employed on the day of election. And in 1840 the same privilege was extended to electors in attendance upon the courts. These slight deviations from the uniform tenor of previous legislation, continued in force until the passage of the act of March 20,1841, “to preserve the purity of elections” (1 Curw. Rev. Stat. 767), when it was again provided, that “each elector shall, in full view of the people assembled at the polls where he offers to vote, deliver, in person, to one of the judges of the election a single ballot or piece of paper, on which shall be written or printed the names of the persons voted for, with a pertinent designation of the office which he or they may be intended to fill; lui no elector shall vote except in the township or ward in which he actually resides.”
This act of 1841, which has continued in force and marked the policy of the state for more than, twenty years, is perhaps one of the most perfect and stringent for the prevention of fraud at elections to be found in any state. It lays down clear and definite rules for ascertaining the residence of any person offering to vote, and, after punishing -with fine and imprisonment a large number of minor offenses, no less than nine of its sections, defining a still larger number of distinct crimes, are devoted to providing imprisonment in the penitentiary of officers and others for various frauds upon the elective franchise.
This, then, was the state of the law at the time the present constitution was framed and adopted. But before proceeding *628 to consider what light it throws upon the provisions of this constitution, and that the comparison may be the more easily made, I shall here state the leading provisions of the act of 1868, now under consideration. By this act, the qualified voters of this state, absent from the township or ward of their residence in the actual military service of the United States or of this state, are entitled to exercise the right of suffrage as fully as if they were present at their usual places of election; and to enable them to do so a poll shall be opened in each company, at the quarters of the commanding officer, at which all electors belonging to the company, and within two milesj must vote; those on detached service, and more than' two miles away, when twenty in number, may organize a poll, and vote thereat. The election is to be conducted substantially as provided in the general law, except that separate returns are to be made for the voters of each county, and transmitted through the post office to the elerhs of their respective counties, where they are to be opened and counted “ as if received from the several townships or wards in said county.” The 19th section provides: “When any election under this act shall be held in this state, all the provisions of the general law in relation to fraud at elections, and the punishment thereof, consistent with the provisions of this act, shall apply to all elections under this act.”
The difference between this act and the requirements of the old constitution, and all previous legislation, is most apparent. And the direct question is presented, whether, without one word of complaint from1 any quarter that the existing constitution and laws, were unnecessarily strict to protect, the ballot box from perversion — nay, in the face of a most palpable attempt to establish another safeguard against abuse — it was intended’by those who framed and adopted the present constitution, that this great institution, in some of its most essential and vital features, should be left to the control of fluctuating majorities in the general assembly ? And whether, in obedience to what is expressly required, the sovereign powers of the state, upon which depends her entire internal government, *629 must be exercised within her own limits, under the protection and restrictions of her own constitution and laws; or may be driven from her borders, and made to depend upon the comity and forbearance of other states ? In my opinion, the proper understanding of a single word, many times used in the constitution, will go far to answer these questions. The terms “ election,” “ annual election,” “ general election,” are constantly repeated, without express definition or description. At these nearly all officers are to be chosen, and “ at all elections ” the voter is to exercise the elective franchise. What, then, does the word election, as used in the constitution, ex vi termini, import ? My answer is that it imports precisely what it had been understood, for more than half a century, to mean — ■ what, at the time the constitution was adopted, statutes then in force, and expressly continued in force by the constitution itself, had clearly and accurately defined it to mean — a public meeting of the electors, within a prescribed election district, at a place designated by public authority, and there, in a public manner, and under the control of public officers, sworn to prevent fraud and make due return of the result, proceeding by ballot to the choice of persons to fill the various offices. Nobody had ever heard of any other sort of election; at such elections the members of the convention were returned, and to such elections they sent the constitution for ratification; and there can be no hazard in affirming that no elector who voted for that ratification could have supposed that the elections provided for the future could be substantially any thing else than those to which he had been accustomed in the past. No term employed in the constitution was better understood by every class of voters. Twice in each year at least they had been accustomed to resort to the polls, and there witness the practical workings of an election, until its essential features, and the time when and the place where the elective franchise was to be exercised had become as familiar as household words. I can not bring myself to the belief that a single individual supposed it possible that the officers of one county could be elected by votes given in another, much lesa *630 by votes given out of the state. Under such circumstances the line of judicial duty is plain.. Words become things, and are to have the effect intended by those who employed them; The supreme court of New Hampshire say: “We regard it as a well settled and unquestioned rule of construction, that the language used by the legislature, in the statutes enacted by them, and that used by the people in the great paramount law which controls the legislature as well as the people, is to be always understood and explained in that sense in which it was used at the time when the constitution and the laws were adopted,” 41 N. H. R. 551.
As I have already intimated, the constitution abounds in general expressions, without any attempt to define the meaning of its terms; and scarcely one of its articles can be properly interpreted without resorting to this important rule of construction. The habeas corpus, the jury trial, and the entire original jurisdiction of this court, are provided for by simple expressions, which it would be impossible to understand without resorting to the definitions and doctrines of the common law as incorporated into the jurisprudence of this state. The case, of Work v. The State, 2 Ohio St. Rep. 296, announces the principle equally applicable to them all: that, wherever the constitution names and establishes any such institution or proceeding, its true character and essential features must be sought for in the system of law from which it is taken, and that it can not be materially changed by the general assembly. The election established by the constitution, was an institution of our own, of more than half a century^s duration, clearly defined by law, and perfectly understood by the people; and I know of no reason why the same principle does not apply to it.
While I admit, to the fullest extent, both the right and duty of the general assembly to supply all necessary legislation to carry these constitutional provisions into effect, and the same to alter at pleasure, I nevertheless insist, that it is no more competent for that body to make an election any thing else than a public meeting of the electors, within'a prescribed ele'c *631 ■tion district, with the right reserved to each, not only to vote himself, but also to guard the ballot-box from illegal voting or other frauds, than it would be to change the character of the habeas corpus or the jury trial. I insist upon this, because these were the indispensable elements which had entered into every election then known, and because this was the sense in which the term was used when the constitution was adopted. While it is exceedingly evident that it was contemplated the election districts would continue to be what they had been for fifty years, and what they were defined to be by legislation continued in force, I have no occasion to deny that they might be changed by law. What I do claim, is, that, upon the theory of an election as then understood, a time arid place, and meeting of the electors, residing within defined limits, for the joint performance of a high public duty, were indispensable to the very existence of the .institution. If I am right in this, and if such was the general understanding at the time, I think there is no particular difficulty in saying, that the constitution has fixed the place of voting, and confined it to the district within which the elector has the prescribed residence.
I grant, at once, that the 1st section of the 5th article is not so explicit upon this point as it should have been, nor nearly so explicit as the corresponding section in the constitution of 1802; but I insist, that any construction which fully preserves all the provisions of the present section, will result in making it substantially the same as the other, so far as this question goes.
The first thing to be noticed, is, that no possible construction, which any one will accept, can be adopted, which will not leave a necessity for implying one or more words at the end of the section. To this there is no objection. It is a perfectly well settled rule, that whatever is within the contemplation of a constitutional provision, or statute, or is necessarily implied from the language of either, is as effectually a part of the law as though it were fully expressed. Or, as expressed by the supreme court of the United States, “ what is "implied in a statute is as much a part of it as what is ex *632 pressed,” Gelpeke v. City of Dubuque, 1 Wallace, 221; United States v. Babbit, 1 Black, 61; Height v. Holly, 10 Wend. 218: Rogers v. Kneeland, 20 Wend. 447.
But it is equally well settled, that no language can be implied which contradicts or impairs what is clearly expressed, but only such as is necessary to carry that fully into effect. Now, this section, after defining the qualifications of an elector, declares, that one having these qualifications shall “be entitled to vote at all elections.” Passing by the perfectly absurd proposition, for which no one would contend, that he was thus given the constitutional right to vote anywhere, or wherever he might select, we are brought to the direct question, Where, within the fair meaning of this provision, was it intended he should vote? I shall undoubtedly be answered, “Wherever the legislature direct or allow.” Whether such an implication can be made, must depend upon the further question, whether, when done, it can stand consistently with other parts of the section, and other provisions of the constitution ? In my opinion, it can not, but would completely nullify the only really new provision intended to be inserted in this section. Amongst the qualifications required of an elector, is that of having resided, “ next preceding the election,” in the “ county, township or ward in which he resides, such time as may be provided by law.” The time is not fixed, but it was made obligatory upon the general assembly to fix some time. The history of the provision, and the reasons upon which it was inserted, are clearly shown in the proceedings of the convention, and are familiar to us all.
By the former constitution, an actual residence “in the county or district, at the time of the election,” only was required. Under this provision abuses had grown up sufficient, in the opinion of a large majority of the convention, to demand correction ; they undertook to correct them by requiring, not only an actual residence “ in the county, township or ward,” at the time of the election, but also for a certain time previous thereto. The evil complained of was this: in the closely contested counties of the state, particularly along the lines of the public *633 works, persons would present themselves on the day of the election, claiming to be actual residents of the townships or wards, and thus be permitted to vote, when in fact they had been brought from other counties or states, by interested parties, and disappeared as soon as the election was over; and in this way the actual residents of those counties were defrauded out of the right to elect their own officers. It was rightfully thought that the requisition of a previous residence would, to a large extent at least, break up these pernicious schemes; and to this end, and with this object, the provision was inserted. It was not adopted as a mere formada of words, but for the substantial purpose of enabling the bona fide electors of counties to know, before the elections, who were entitled to vote, and at the elections, through the officers charged with the duty of conducting them, to protect themselves from fraud. Any construction of the constitution which does not preserve to them this power, and answer this purpose, is a perversion of it; and any legislation which subverts this policy is flatly inconsistent with an important constitutional provision. Now, if the general assembly may authorize persons claiming to be residents of one county to vote at elections in any or all the other counties of the state, or themselves organize, conduct and vote at elections in such other counties, when the votes are never returned to, or in any way subjected to the scrutiny of, the local officers where they claim to reside; it is not too much to say, that the constitutional provision is not worth the parchment upon which it is written. Such legislation completely annihilates the means, and the only means, relied upon to make this provision practically operative. What knowledge can either the electors or officers in a distant county be presumed to have of the right of such persons to vote in the county where their residence is claimed? Or, if they should chance to have the knowledge, what interest can they have to guard the election of officers whose official acts can never concern them ? And, if such persons are not only empowered to vote, but to organize and conduct the elections at which they do it, is it to be expected that they will protect the community *634 against their own frauds ? To suppose that no one will attempt to vote who is not legally authorized to do so, or that no fraud will be committed upon actual electors by officers or others, is not only to ignore all past experience, but to make all constitutional and statutory provisions made to prevent such frauds, unnecessary and absurd.
Two leading purposes are most apparent in every part of this 5th article of the constitution — a wide extension of the elective franchise, and careful provisions to protect it from fraud, and to secure the freedom of elections. Without a rigid enforcement of the last, the true will of the people can never be ascertained, and the first becomes worse than useless ; and, in my opinion, it does not admit of the slightest doubt that among these latter provisions none was regarded as more important than that Avhich required an actual previous residence of the elector in the place where he was expected to vote. Noav, as it is agreed that an implication must be made, and an implication restrictive of the general words importing a right “ to vote at all elections,” Avhat, in view of the whole section, should that implication be? The answer is plain and obvious. It only requires that the Avords “ therein,” or “held therein,” should be understood at the end of the section, to give full effect to every provision contained in it and in every other part of the instrument.
This is the natural and necessary implication. It simply restrains the meaning of the general words used at the close of the section, to make them consistent with language which stands in immediate connection with them. This section, no one doubts, has made a local residence, not lost or impaired by a temporary absence, in the K county, township, or ward,” at and before the election, an indispensable condition to the right to vote. Without local voting also this provision is unmeaning and useless ; and local voting is explicitly provided for when the last clause is construed to give the right to “ vote at all elections ” held in the locality of the voter’s residence. This construction neither contradicts nor perverts a single word of the section. It prevents one of its provisions *635 from nullifying another; preserves the “places of voting” referred to in the constitution; and requires nothing more than an application of the well-settled rule which restrains general words “to the fitness of the matter,” when they would otherwise conflict with the general policy, or other provisions of the instrument in which they are used.
When a still broader view is taken, and. the section is read in the light of the former constitution, of previous legislation, and of the actual circumstances which surrounded those who framed and adopted the present, this construction becomes-still more obvious and imperative.
This is no new attempt to localize the exercise of the elective franchise. By the 1st section of the 4th article of the constitution of 1802, it was expressly provided that “ no person shall be entitled to vote except in the county or district in which he shall actually reside at the time of the election.”
As we have already seen every act of legislation under that constitution, with two slight and temporary exceptions, still further localized the right by confining it to the township or ward in which the elector had his actual residence. These exceptions, under peculiar circumstances, extending the right to other townships of the same county, after a very short experience were found to be dangerous or inexpedient, and the acts which created them were repealed. In the face of this uniform and long-continued policy of the state, the convention was called “ for the purpose of revising, amending or changing the constitution.” Its proceedings will.be searched in vain for the slightest indication of any dissatisfaction with this policy, or of any purpose to abandon this important safeguard against fraud in the future. On the contrary, it is abundantly manifest that its continuance was every where assumed, and undeniably clear that a new provision, in furtherance of the same general policy, was provided. In the absence of all complaint, in or out of the convention, no intentional change can be fairly presumed; and the utmost which candor will allow to be claimed is, that, in recasting the language of the section to introduce the new provision, the old *636 restriction was lost. Such a construction, which ignores the intention by adhering to the letter, and substantially nullifies an important provision newly inserted, can never be satisfactory. It would come much nearer being due to a penal enactment than to the constitution of a state, in the construction of which it becomes the imperative duty of the court “ to ascertain the spirit of the fundamental law, and so to carry it out as to avoid a sacrifice of those interests which it is designed to protect.” In my opinion, this only is done when the clause of the section making a previous residence indispensable to the qualifications of an elector, is read and considered in connection with that declaring his right to vote “ at all elections,” and when both are subjected to the same geographical limitation. Thus, leaving to the General Assembly, under this constitution as under the former, the right to mold or change the election districts, to require a residence only in the county, and to give the right to vote for state or county officers any where in the county of the elector’s residence, at its discretion; but denying it the power to defeat the very object of a previous residence, by allowing the voting for one county to be done in another, away from the body of its electors, and from the supervision and control of the election officers constituted by them.
2. But, suppose I am wrong in the construction I have placed upon the 1st section of the 5th article, and that it was intended to leave the general assembly at liberty to allow or require the county officers of each county to be elected by votes given in any or all the other counties of the state — those of Cuyahoga by votes given in Hamilton, and e converso — I am still clear in the opinion that, when the act in question is construed to authorize elections to be held, and votes given, beyond the limits of this state, it is inconsistent, not only with the necessarily implied limitations upon the power of the general assembly, but also with several express provisions of the constitution. Amongst the implied limitations upon the legislative power of every government, none can be more obvious than that which confines its operation and effect within *637 the limits of the state. No principle of public law is so universally acquiesced in by writers of every country, and every shade of opinion, as that which declares, that the laws of a country, in virtue of any inherent authority, can have no extra-territorial force.
The whole subject has been treated by two eminent jurists of our own, whose works are received as authority in every enlightened country, with such learning and ability as to make a resort to other authorities wholly unnecessary.
I shall only have occasion to refer to the most elementary of the principles stated by them, as alone necessary to the decision of the question under consideration.
In his work on the Conflict of Laws (sec. 7), Mr. Justice Story says: “ It is plain, that the laws of one country can have no intrinsic force, propio vigore, except within the territorial limits and jurisdiction of that country. They can bind only its own subjects, and others who are within its jurisdictional limits; and the latter only while they remain therein. No other nation, or its subjects, are bound to yield the slightest obedience to those laws.” And again, after stating and commenting upon the proposition, “that every nation possesses an exclusive sovereignty and jurisdiction within its own territory,” he says (sec. 20): “ Another maxim,, or proposition, is, that no state or nation can, by its laws, directly affect, or bind, property out of its own territory, or bind persons not resident therein, whether they are natural-born subjects or others. This is a natural consequence of the first proposition; for it would be wholly incompatible with the equality and exclusiveness of the sovereignty of all nations,, that any one nation should be at liberty to regulate either persons or things not within its own territory. It would be equivalent to a declaration that the sovereignty over a territory was never exclusive in any nation, but only concurrent with all nations; that each could legislate for all, and none for itself; and that all might establish rules, which none were bound to obey. The absurd results of such a state of things need not be dwelt upon.”
*638 Mr. Wheaton, in his work on International Law, has treated both these propositions with his usual clearness and ability. In respect to the last, he says: “The second general principle is, that no state can, by its laws, directly affect, bind or regulate property beyond its own territory, or control persons who do not reside within it, whether they be native-born subjects or not. This is a consequence of the first general principle: a different system, which would recognize in each state the power of regulating persons or things beyond its territory, would exclude the equality of rights among different states, and the exclusive sovereignty which belongs to each of them.” Lawrence’s Wheaton, 161.
The cases now before the cpurt do not furnish any occasion for considering what have sometimes (but very improperly) been treated as exceptions to these general rules; as no one of them has the remotest relation to the act under consideration. I am quite well aware that, in European countries, where the doctrine of perpetual allegiance obtains, the claim is made, “ that every nation has a right to bind its own subjects by its own laws in every other place.” But, as Justice Story well remarks: “Whatever may be the intrinsic or ob-' ligatory force of such laws upon such persons, if they should return to their native country, they can have none in other nations wherein they reside;” and that, “when we speak of the right of a state to bind its own native subjects everywhere, we speak only of its own claim and exercise of sovereignty over them when they return within its own territorial jurisdiction, and not of its right to compel or require obedience to such laws on the part of other nations within their own territorial sovereignty.” Confl. of Laws, 23.
As the same learned author very correctly adds: “ Whatever force and obligation the laws of one country have in another, depend solely upon the laws and municipal regulations of the latter — that is to say, upon its own proper jurisprudence and polity, and upon its own express or tacit consent.” Id. This is but an application of the doctrine upon which the laws of one country are executed in another, by what is called the *639 comity of states. This doctrine involves no claim, but distinctly repudiates it, for the extra-territorial force of laws. Its true foundation, and the theory upon which it is applied, have been nowhere more clearly and pertinently stated than by Swan, J., in Anderson v. Poindexter, 6 Ohio St. Rep. 622. He says: “It has been too often determined to admit of cavil or question that the laws of each state have no extra-territorial operation within the jurisdiction of another, except such as may be adopted by her laws; and if, by comity, operation is given to the laws of such other state, they are no longer extraterritorial, but become, thereby, the municipal law of the state which adopts them.”
I am also very well aware that, by the law of nations, states in the full exercise of all .political power, are invested, for certain purposes, with what is denominated external sovereignty. The distinction between that and internal sovereignty, is thus explicitly stated by Mr. Wheaton: “ Internal sovereignty is that which is inherent in the people of any state, or vested in its ruler, by its municipal constitution or fundamental laws. This is the object of what has been called internal public law, droit public interne, but which may more properly be termed constitutional law. External sovereignty consists in the independence of one political society in respect to all other political societies. It is by the exercise of this branch of sovereignty that the international relations of one political society are maintained, in peace and in Avar, with all other political societies. The laAV by which it is regulated has, therefore, been‘called external public law, droit public externe, but may more properly be termed international laAf.” Lawrence’s Wheaton, 35. ■
Whether the separate states composing the American union, divested of the power to make war, and to maintain treaty relations with each other, or foreign states, are wholly shorn (as Mr. Wheaton thinks) of all external sovereignty, it is in no way material to inquire. I suppose no one will doubt that the right to vote and hold office must be derived exclusively from the constitution of the state; nor but that the election and *640 qualification of the necessary officers for her internal government, is the simple exercise of her internal sovereignty. And, on the other hand, it has never yet been doubted that, in respect to every thing not confided to the federal government by the constitution of the union, including territorial exclusiveness, these states are completely sovereign, and independent of, and foreign to, each other. This has been the current language of courts and jurists from the earliest period, and is nowhere declared with greater force and precision than by the supreme court of the United States, in Bank of Augusta v. Earl, 13 Pet. R. 584.
We are thus, for every purpose material to the present inquiry, remitted to the full force and effect of the proposition which denies to our legislation any effect beyond the limits of the state. Within the state, every provision of the constitution, and every statutory enactment designed to secure the freedom of the electors, the purity of the election, or to punish fraud, corruption and violence, has the force of law, and may be enforced for or against every person within its borders ; beyond its territorial jurisdiction, they are all utterly powerless, either for protection or punishment. I do not question the right of the people of the state to provide for the election of its officers by votes given outside of its limits; but I insist that as yet they have conferred no such power upon the general assembly, and that that body can make no such provision consistently'with the express requirements of the constitution. This presents a question of construction, with the constantly recurring obligation to interpret the language of the instrument as it was understood and intended by those who framed and adopted it. It will also be necessary to bear in mind that every direction of the constitution to accomplish an object in a specified manner, “carries with it an implied prohibition against, doing the thing prescribed in any other way.” Now, as we have already seen, by the 2d section of the 10th article, the necessary county officers are to be elected by the qualified electors in each county, in the manner provided by law. It was made the imperative duty of the general as *641 sembly to determine what officers were necessary, and to provide, by law, a mode and manner for electing them. The time when, and the persons by whom, they were to be elected are fixed by the constitution, but the mode and manner of their election are left to be supplied by legislation. It is quite immaterial whether this duty is imposed by permissive or mandatory language. Without such legislation no officers could be elected, and without officers the entire county organizations would be powerless to perform their public duties. Under such circumstances, it is perfectly well settled that may means shall, and that the power to do an act which concerns the public interests is a command to do it, and the execution of the power may be insisted on as a duty. (Sedg. on Star, and Const. Law, 438). And, as was well said by the supreme court of Connecticut, “No duty could be more imperative for legislators, sworn to support the constitution, than to make laws to carry that constitution into effect.” 13 Conn. R. 125.
We have, then, the positive command of a superior given to an inferior of its own creation, whose powers of legislation are confined within the limits of the state, to effect the election of officers in a manner prescribed by law, and denying it the power to accomplish this object in any other manner; and we have that inferior endeavoring to execute the power and avoid the prohibition, by providing for their election where it has no power to give effect to any law of its enactingj and where no law whatever can be made to govern one single step in the proceeding. The one may be consistent with the other, but if so, I confess my inability to see it. To my apprehension, this mandate of the people was intended to require every thing connected with the manner of conducting the elections at which these officers were chosen, from the first step in the proceeding to the last, to be governed, controlled and regulated by law — by that “ rule of civil conduct prescribed” by the law-making power which commands the right and prohibits the wrong, with .its sanctions and commanding authority to compel obedience to its requirements. ■ The language certainly imports nothing less, and no one will *642 pretend that those who voted for the adoption of the constitution could, at that time, have contemplated any thing else. Fairly considered, it is a power coupled with an obligation to effect a prescribed object, by proceedings governed by the authority of law, and not otherwise'; and, in the nature of things, it can only be executed where law can be made to perform this office, which it is impossible to do beyond the jurisdiction of the law-making power.
The constitution abounds in provisions, either requiring or allowing the general assembly to accomplish particular purposes by legislation. Amongst others, by language as general as could be used, it is authorized to remove the seat of government, and to fix other places for holding the terms of this court. But would anybody suppose that it had the power to fix the one at Wheeling and the other at Pittsburg? Or, if it should, that a valid law could be passed, or judgment rendered, at either of those places? However general the language of a constitution or statute may be, it is always to be remembered that it.was made for the state, with its definite geographical limits, and when the language is applied to its proper rsubject matter, it becomes manifest that it was intended to have mo wider scope. This is the rule of construction universally .■•adopted; and this, and the proposition which denies the general assembly any extra-territorial power,havebeenrepeatedly mffirmed in the decisions of this court.
In Steamboat Ohio v. Stunt, 10 Ohio St. Rep. 582, the question was directly presented, whether, as against citizens of this .•state, -owning and running a steamboat on waters bordering •upon the state, it was competent for the legislature to create .a liability arising out of the use of the craft when employed ■beyond the limits of the state; and it was held, that it was not, 'That, while the legislature might provide remedies for the enforcement of liabilities arising out of the state, it could not M create personal liabilities and impose them on persons and ■property out of the jurisdiction of Ohio, and on account of ■transactions -occurring beyond the territorial limits of the •state.”
*643 A like decision was made in Booth v. Hubbard, 8 Ohio St. Rep. 243, arising upon the “ act requiring compensation foi causing death by wrongful act, neglect or default.” This act, in terms wholly unlimited, declares the liability of any one causing the death of another by wrongful act, neglect, or default. In the defense it was claimed, that the act complained of occurred on the Virginia side of the Ohio river. Mr. Justice Scott, in delivering the opinion of the court, said: “ As the right of action in this case is given solely by statute, and as this statute oan have no extra-territorial force, it follows that unless the cause of action occurred within this state, the defendants were entitled to a verdict.”
In Stetson v. The City Bank of New Orleans, 2 Ohio St. Rep. 174, the court, in construing certain statutes relating to dissolved corporations, say: “The legislature, having no extra-territorial power, must be presumed to intend to confine their operation to institutions within its jurisdiction;” and in the case of Woodward v. The Michigan Southern and Northern Indiana R. R. Co., 10 Ohio St. Rep. 122, Judge Gholson, speaking of the same question in regard to an Illinois statute, said: “ General words in statutes must always be construed in view of the territorial limit to the powers of the legislature. The legislature of Illinois did not intend to provide as to acts of negligence not occurring in that state; and did not intend to impose a trust or duty upon officers not appointed or acting under its laws. It is clear that an effort of the kind, had it been made, would have availed nothing beyond the limits and jurisdiction of that state.”
The case of Miller v. Ewer, 27 Maine R. 509, is a most express and positive authority upon both the propositions under consideration. The legislature of that state, in granting an act of incorporation to certain persons, had authorized them to organize the corporation at a meeting called for that purpose, and had expressly provided that they “are hereby empowered to call the first meeting at such time and place, and in such manner, as they think proper.” They met in the city of New York, elected a board of directors, and appointed an- *644 agent to dispose of property in Maine. The question arose as to the title to this property, and was made to depend upon the validity of the proceedings of the corporators in New York. The court concede the right of a corporation, created in one state, to contract and sue in another, when permitted to do so by the laws of the latter; and, after stating the rule of construction to be, “that legislation, if it be possible to avoid it, is not to be so construed as to exceed the sovereignty of the legislative power,” they proceed to express their opinion upon the act of incorporation thus: “ That law is imperative beyond the bounds of the legislative power by which it is enacted. As the corporate faculty can not accompany the natural persons beyond the bounds of the sovereignty which confers it, and they can not possess and exercise it there; they can have no more power there to make the artificial being act, than other persons not named or associated as corporators. Any attempt to exercise such a faculty there, is merely an usurpation of authority by persons destitute of it, and acting without any legal capacity to act in that manner. It follows that all votes and proceedings of persons professing to act in the capacity of corporators, when assembled without the bounds of the sovereignty granting the charter, are wholly void. This is a familiar principle when applied in analogous cases to persons upon whom the law has conferred some power or faculty, which, as natural persons, they do not possess. The power conferred by law upon executors and administrators can not accompany their persons beyond the bounds of the sovereignty which has conferred it. Story has collected numerous cases, in note under section 512, in his treaties upon the Conflict of Laws, proving this doctrine to be established both in England and in this country. The same doctrine prevails respecting the powers of guardians.”
And, finally, Mr. Justice Story, in Farnum v. Blackstone Canal Co., 1 Sum. R. 46, in holding that an act of the legislature of Massachusetts, expressed in general terms, was inoperative to justify the raising of a dam which flowed back-water into the State of Rhode Island, expressed himself thus, upon *645 the rule of construction: “Now, the general rule certainly is, that every legislative act ought to receive a reasonable construction ; and it can not be presumed that a legislature authorizes any act to be done in a foreign territory, when that act is beyond the reach of its proper jurisdiction. Every legislature, however broad may be its enactments, is supposed to confine them to cases or persons within the reach of its sovereignty.”
I can not but feel that I am performing a work of supererrogation in entering upon so extended an examination of questions which are so conclusively settled. My object, however, has been to demonstate, beyond doubt or equivocation, from the language of the constitution, and the writings of jurists, and the solemn adjudications of courts, that the constitution itself has imposed upon the general assembly the positive obligation of prescribing and reguluting by law the manner of conducting the elections for these officers, and has thereby excluded all other modes for effecting this object; that the general assembly is invested with no power to authorize or control these elections, in foreign territory, beyond the limits of the state; and that a fair and reasonable construction of the constitutional mandate, in the light of principles universally acknowledged, requires that body to provide for holding them within the state, where they may be regulated and governed by law, and within the limits of the sovereign authority of the people who have conferred this power and imposed this duty. And, as a consequence, that all elections held, and votes given, beyond the state, are held and given without the authority of the constitution and laws of the state, from which alone they can derive any efficiency, and are null and void.
If it is true of a legislative enactment, however broad its terms may be, that it must nevertheless be construed to extend only “to cases or persons within the reach” of the lawmaking power; and if it be further true, that every “power or faculty” conferred by law upon individuals ceases to be operative when such persons are “ assembled without the *646 bounds of tbe sovereignty granting it,” and so effectually so that a corporation even can not be there organized, it is equally true of a constitutional provision, and of the power and faculty conferred upon individuals of exercising the elective franchise. And I can conceive of nothing more nearly approaching an absurdity than that of a people, limited in their powers and faculties to the state they inhabit, expressly requiring a legislative body, Avith powers equally limited, to regulate and govern by law elections held outside of the territorial jurisdiction of either. The utmost that the people themselves, by an express provision, could do, would be to give effect within the state to votes cast at elections which they could neither regulate, govern, or control by law. It is enough to say, that no such intention is manifest in any part of the constitution. On the contrary, it is as true here as in California, that elections were intended to be made, from first to last, the subjects of legal regulation and control; and I adopt as my own, the language of the supreme court of that state, as declared by Mr. Justice Baldwin, in McCune v. Weller, 11 Cal. Rep. 49. He says: “ I had supposed that it was a proposition not to be controverted, that it is by virtue of statutes alone that all valid elections are held. It has never before been pretended that a person could make title to an office through the popular vote, unless such vote was cast in pursuance of legislative regulation and authority. All the efficacy given to the act of casting a ballot is derived from the law-making power, and through legal enactments; and, indeed, the legislature must provide for and regulate the, conduct of an election, or' there can be none. The convention found the subject of popular election instituted and regulated by law, and the framers of the constitution are to be understood as speaking of, and referring to, such an entity as then existed, or might afterward exist, by force of statute regulation.”
It will not be pretended that this construction of the constitution takes away any thing it was supposed to grant, or makes it any thing else than what it was supposed to be by those who framed and adopted it. It is to-day Avhat it was *647 tbe da,y it took effect, and requires the construction now, which would have been given it then. I do not believe there was then an intelligent man in the state who supposed it legally possible that the local officers of the state could be chosen by votes given outside of its limits, or otherwise than at elections governed and regulated by law. If this is not entirely conclusive of what may be done without violating the provisions of the instrument, it ought at least to save it from those refinements of construction which result in consequences never contemplated; and especially from those which abridge the privileges expressly provided, or impair the means indispensably necessary to carry into effect its declared purposes. The act in question can not be executed without resulting in such consequences. To secure the freedom of elections, and the persons of the electors from restraint, they are privileged from arrest while attending upon elections, and in going to and returning therefrom, except upon charges of crime. This important provision, designed no less for the protection of the community than the elector, it must be admitted, becomes wholly inoperative when the boundaries of the state are passed. Again, no country in the world, it is believed, where popular elections have prevailed has been able to preserve their purity, and protect them from violence, corruption and fraud, without the aid of stringent penal enactments; and there is no reason to suppose that those who made them the corner stone of our political edifice entertained any idea that such enactments could be dispensed with here. Mr. Justice Blaclcstone informs us that, at Athens, “ a stranger who interfered in the assemblies of the people was punished by their laws with death; because such a man was deemed guilty of high treason by usurping those rights of sovereignty to which he had no title.” And, after quoting the opinion of Mr. Locke that any interference of the executive magistrate which destroys the freedom of elections, or corrupts the electors, is a breach of trust which “amounts to a dissolution of the government,” he proceeds, with admirable clearness, to delineate the measures adopted to secure the freedom and purity of an *648 English election, and the multiplied punishments provided for bribery, fraud and corruption, which have been found necessary in one of the oldest and most enlightened of modern nations. 1 Black. Com. 179. It is certain that no election was ever held in this state without the restraining influence of such enactments; and equally certain that they can not be extended to the protection of elections held beyond its territorial jurisdiction. Indeed, the general assembly, in this very act, confesses its total inability to give them such extension by expressly confining their operation to elections held within the state. While, within the state, all illegal voting, all attempts to deceive, corrupt or coerce an elector, and all frauds committed by officers in receiving and canvassing the ballots, or making return of the result, are punished with the utmost severity, every one of these nefarious acts may be practiced with impunity at elections held outside of its boundaries. The constitution itself has, I think, settled the proposition, that acts committed beyond our jurisdiction can not be punished, by requiring every criminal prosecution to be tried by a “jury of the county or district in which the offense is alleged to have been committed.” But it is equally clear upon general principles. As is said by Mr. Wheaton: “ By the common law of England, which has been adopted, in this respect in the United States, criminal offenses are considered as altogether local, and are justiciable only by the courts of that county where the offense is committed.” Lawrence’s Wheat. 281. It is no where claimed that a state can arrest a supposed offender in the territory of another state, or that it can • provide punishments for acts done beyond its jurisdiction upon any but its own subjects; and even if the doctrine which obtains in continental countries, that such persons may be punished upon, their voluntary return into their own country, Avas applicable here, the bearing of the proposition would not be practically and materially changed. Candor and truth must compel the admission, that to authorize elections in foreign territory, is to nullify as to them the express provision of the constitution which privileges the elector from *649 arrest, and practically to deprive them of all aid from criminal legislation, hitherto deemed essential to their very existence; and when the constitution is made consistent with itself, and full effect is given to all its parts, and all are made to harmonize, it seems to me evident that a construction resulting in such consequences is wholly inadmissible.
There is no weight in the argument, that the right to vote is a mere personal privilege, carried by the elector wherever he may go, and properly exercised wherever he may be. It is difficult to conceive of a more complete misconception of the foundation and objects of the elective franchise, than such an argument involves. It is a right derived from the constitution alone — a public franchise, belonging to the whole community, conferred upon about one fifth of its members, to be exercised for the common benefit of the whole, and under such proper safeguards against abuse and perversion, as the fundamental laws of the community have provided; and “whoever would claim the franchise which the constitution grants, must exercise it in the manner the constitution prescribes.” In -the language of the supreme court of Pennsylvania, “our constitution and laws treat the elective franchise as a sacred trust, committed only to that portion of the citizens who come up to the prescribed standards of qiralification, and to be exercised by them at the time and place, and in the manner prearranged by public law and proclamations — and whilst being exercised, to be guarded, down to the instant of its final consummation, by magistrates and constables, and by oaths and penalties.” Chase v. Miller, 2 Am. L. R. N. S. 160. As is further said by that court: “ The labor of the constitution has not been to restrict suffrage in any spirit of distrust of popular intelligence, but it has been to define it so exactly that it might be preserved from abuse and perversion.” And it may be added, that, while the constitution and a sound public policy equally foster and invite the fullest, freest and fairest expression of the whole body of electors which it is practicable to obtain, all its provisions, requiring them to vote where they reside, and where they are known to those who are to act with them, *650 and under the restraints and protection of law, are intended to protect them, and the community whose franchise they exercise, from the unlawful intrusions of those not qualified; to insure honesty and fidelity in receiving, preserving, and returning their votes; and to inspire that confidence in the purity of elections, and the certainty of their results, which secures absolute acquiescence in the decisions of the majority, and constitutes the strength and security of popular governments.
When the present constitution was adopted, these regulations for the exercise of*the elective franchise had existed in constitutional provisions for nearly half a century; were perfectly understood and universally approved. No reason was then known, or could have been anticipated, why they should be changed or dispensed with in the future; and, as I think, no change was made, except to render them still more effective for the purposes intended. If such reasons are now thought to exist, it belongs neither to the general assembly nor to this court to make the change, but to the people, whose work the constitution is, who originally made and ordained it, and who can at all times, in the mode prescribed by themselves, make it conform to their sovereign will and pleasure.
In arriving at the conclusions I have, I have preferred to base them upon the language of the constitution itself, construed in the light of principles approved by time and experience, rather than to invoke the authority of a few very recent decisions, made upon similar enactments. I should not, however, omit to state, that in three of the old states, enactments, having the .same'object as ours, have been passed upon by the highest judicial tribunals of those states, and, in each instance, declared in conflict with the constitution; while in one of the new states (Iowa), it is said a different decision has been made, but upon what grounds — not having seen a report of the case— I am not advised.
In New Hampshire, the act allowed the vote to be polled by another person, under a power of attorney; and it was held, *651 that voting by ballot, imported the personal presence of the voter at the polls. 1 Am. L. Reg. N. S. 740.
In Connecticut, the act was substantially like our own, and it was held to be in conflict with provisions of the constitution, which required the officers to be elected at “meetings of the electors” to be “holden on the first Monday of April in each year.” 2 Am. L. Reg. N. S. 460. I have already given my reasons for supposing that the elections required by our constitution are no less “ meetings of the electors.” They had always been so defined by law; and while the constitution of Connecticut enters much more into details than ours, an election there involves no single element which, by law and common understanding, has not always belonged to one here.
In Pennsylvania, a similar act was declared repugnant to a provision of the constitution of that state, which required a residence of one year in the state, “ and in the election district where he offers to ‘vote, ten days immediately preceding such election.” The court say: “Place became an element of suffrage for a two-fold purpose. "Without the district residence, no man shall vote; but having had the district residence, the right it confers is, to vote in that district. Such is the voice of the constitution. The test and the rule are equally obligatory.” Chase v. Miller, 2 Am. L. Reg. N. S. 146.
I have also given my reasons for the opinion, that the constitution of this state, when the clause requiring a previous residence,- and that which declares the right to vote, are construed, as they stand, together, and the natural implication, which saves the first from absurdity, is .made to the last, also confines the right to the county, township or ward of the elector’s residence.
In thus stating my views, at much greater length than I had originally intended, upon some of the important questions involved in these cases, I have intended to confine myself to the legal bearings of the controversy alone. With the policy of this enactment, any further than its policy is involved in a proper construction of the constitution, I have no concern. It will be a sad day for constitutional government, when legis *652 Iative enactments are either sustained or overthrown, upon mere considerations of temporary policy or expediency.
It would have given me much greater pleasure to have been able to concur with the general assembly, in the nearly or quite unanimous votes by which this act was passed,- than to be under the necessity of assigning the reasons which lead me to the conclusion that they have mistaken their constitutional powers. But my convictions are so unalterably fixed that I can not bring myself to that state of reasonable doubt even, upon which enactments are customarily saved. I have no doubt that this act, in so far as it substantially nullifies the express requirement of a previous residence, and undertakes to do, beyond the limits of the state, and without the force and authority of law, what is expressly required to be done within its limits, and by law, is inconsistent with both the letter and spirit of the constitution; and, with these convictions, fidelity to the high trust with which I have been invested by the people, and the solemn oath I have taken to support the constitution, equally require me so to declare.
I am not amongst those who believe that frequent and wide departures from the spirit and purposes of the fundamental law can be indulged in, and an easy and safe retumbe effected to that normal condition which makes the constitution what it was designed to be, the guardian of free institutions, and of life, liberty and property.
My views upon this subject have been so well expressed by a very learned and accomplished jurist in a sister state, that I can not do so well as to adopt his language. “ Believing,” he says, “as I do, that the success of free institutions depends on a rigid adherence to the fundamental law, I have never yielded to considerations of expediency in expounding it. There is always some plausible reason. for the latitudinarian constructions which are resorted to for the purpose.of acquiring power — some evil to be avoided, or some good to be attained by pushing the powers of the government beyond their legitimate boundary. It is by yielding to such influences that constitutions áre gradually undermined and finally overthrown. *653 My rule has ever been to follow the fundamental law as it is written, regardless of consequences. If the law does not work well, the people can amend it; and inconveniences can be borne long enough to await that process. But if the legislature or the courts undertake to cure defects by forced and unnatural constructions, they inflict a wound upon the constitution which nothing can heal. One step taken by the legislature or the judiciary, in enlarging the powers of the government, opens the door for another, which will be sure to follow; aDd so the process goes on, until all respect for the fundamental law is lost, and the powers' of the government are just what those in authority please to call them,” Bronson, J., in Oakley v. Aspinwall, 3 Conn. 568.
In my opinion, the judgments of the court below are correct, and should be affirmed.